STICHT v. BUFFALO CEREAL CO.

(Supreme Court, Appellate Division, Fourth Department. December 28, 1906.)

MASTER AND SERVANT—ACTION FOR INJURIES TO SERVANT—QUESTION FOR JURY.
  In an action for injuries to a servant employed in a cereal mill, owing to an explosion of dust, held, under the evidence, error to have submitted to the jury a question whether defendant was negligent in not providing a certain device and in permitting an accumulation of dust.

  [Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 1010–1050.]

  Kruse and Spring, JJ., dissenting.

Appeal from Trial Term, Erie County.

Action by John Sticht against the Buffalo Cereal Company. From a judgment in favor of plaintiff, defendant appeals. Reversed, and new trial ordered.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

Clarence MacGregor, for appellant.
Hamilton Ward, for respondent.

NASH, J. The plaintiff sustained injuries, caused by a dust explosion in the defendant's mill. The defendant was engaged in manufacturing cereals and grinding oat hulls, the covering of the berry of the oat, a by-product, mixed with other grains for feed. Some of the oat hulls were produced from oats ground in the mill, and some were purchased by the defendant and brought in car lots from outside points.

In the process of manufacture the whole oats were received in an elevator, and passed over a screen to an elevator bin, and from the elevator bin drawn to the cleaning department, where they go through 11 machines designed to clean the oats from all impurities. They then go to the dry kiln, where they are thoroughly dried. Then they pass over the huller stones, placed at such a distance apart as not to crush the oat, but remove the hulls. The hulls are then separated from the groats or berry of the oat, by passing over a fine sieve, which removes the fine dust. Then they pass into a machine known as the "oat hull separator," and by means of air suction the oat hulls are drawn away from the heavier groats. The oat hulls pass through a conveyor to a bin in the elevator. From the bin they are drawn to the third floor of the feed mill, and then pass down to the second floor, where they pass over a magnetic separator, a machine designed to remove all metals which by chance should be in the oat hulls. Then they pass to the first floor, into the attrition mill, where they are ground into a fine substance, and then to the cellar, and are then elevated to the top floor, and flow into a hopper bin from the top, and pass through the bin to sacks, according to the will of the packer, at the bottom of the hopper on the second floor. The oat hulls which came from the outside were also subjected to a cleaning process. Upon being received from the car, they were screened through a grater, which consisted of rods with spaces an inch apart, which was designed to remove all coarse foreign substances, and then conveyed to the bin, where the oat hulls coming from the oatmeal mill were kept, and from that point the process was the same as described.

By reason of the thinness and lightness of these oat hulls, they are extremely hard to grind, and machines known as "attrition mills" are provided for this purpose. These mills consist of two iron discs, set close together, which revolve in opposite directions at a very high rate of speed, grinding the oat hulls between the plates as they revolve; each plate revolving 1,000 to 2,500 revolutions a minute. To grind these oat hulls, these discs are practically in contact, the thickness of a couple of sheets of paper apart. Foreign substances, getting between the discs, are apt to throw sparks. The defendant's mill consisted of three parts, the feed mill, the oatmeal mill, and the elevator; the mills being on either side of the elevator. The explosion occurred in the feed mill, where at the time they were engaged in grinding oat hulls, and was supposedly caused by some metallic substance being caught in the revolving knives at the attrition mill, creating a spark which was carried along with the ground product until it reached a bin, and, dropping into the bin, which was filled with the suspended dust of the ground product, ignited this dust and caused the explosion. The attrition mill was located on the first floor, and the ground product went

from the attrition mill to the cellar, and was then elevated to the third floor, and dropped into a hopper bin, which occupied the third floor and extended down into the second floor·

The plaintiff had been in the employ of the defendant for a period of about two months, and during that time he had been engaged on the second floor of the defendant's mill, sewing bags, and filling bags with the product of the mill, and weighing them. ·At the time of the explosion the defendant was filling a bag at one of the spouts connected with one of the bins on the second floor. The effect of the explosion was to fill the room for some distance from the bins with flame, and plaintiff's hands, face, and neck were burned. The case was submitted to the jury upon three propositions: (1) Was the defendant negligent in failing to use a scalping machine, in addition to the magnetic separator, for the purpose of separating foreign substances from the hulls? (2) Did the defendant negligently permit an accumulation of dust, which increased the danger from explosion? (3) Was the defendant negligent in failing to warn the plaintiff of the latent dangers connected with his work? The jury rendered a general verdict.

To sustain the allegation that the defendant was negligent in not using a scalping machine in addition to the magnetic separator, the plaintiff called as witnesses two experts, Mr. Ortman and Mr. Gordon.

Mr. Ortman testified that he had been superintendent of the George Urban mill, in Buffalo, 22 years, where the kind of work done was making flour. He was familiar with the general process of milling, and knew what an attrition mill is. Had observed them in operation; mostly for grinding coarse cereals. The grain is fed into an attrition mill through a spout over the top. He was familiar with the effect of foreign substances getting into an attrition mill. The effect of a piece of iron getting into an attrition mill is that it is apt to throw sparks. The method generally in use for preventing foreign substances from getting into an attrition mill is a scalper. That device is a sieve that oscillates. It is spread under the elevator that carries the feed to the grinding mill, so that the feed passes over this before it reaches the attrition mill. The oscillation of the sieve shoves the foreign substances to one side while the fine grain goes through. "We have used scalpers in front of feed mills for 30 years. They are merely to prevent spoiling the mills. * * * A magnetic separator is a machine with a number of magnets, where the material runs over to the mill. It takes out the iron, wire, and any metallic substance. I have known substances to go by, especially where the feed is heavy. The magnetic separator is generally used in a feed mill in connection with a sieve, screen, or scalper. I have not observed the grinding of oat hulls. I have been familiar with the method of grinding oat hulls for a number of years, through trade journals and talking to other millers. I have had no experience in grinding oat hulls in an attrition mill. The opportunities are many of picking up any foreign substances. In the carrier a bolt becomes loose, or screws might wear away from the wood and come off. This magnetic separator is there to take out these mineral substances. I have known instances where something went through. * * * The magnetic separator is the usual and customary way to take out foreign substances before grinding."

A sample of oat hulls having been shown to this witness, he testified: further:

"You would have to have, to properly sieve that, about a quarter of an inch mesh in the screen. Small particles might go through—tacks or small pieces of glass—so that it would only pick out such pieces of foreign substances as was more than a quarter of an inch in diameter. My system of scalping wouldn't be any good, excepting for pieces that wouldn't go through the quarter inch mesh. Small pieces less than a quarter of an inch probably would go through. The magnetic separator should be placed after it had gone through the scalper. The purpose of this scalping is an extra precaution. I have never seen one used in connection with a magnetic separator. The magnetic separator is the latest known device for separating foreign substances from the grain."

Gordon is a miller of 32 years' experience, but had never ground any oat hulls. He testified:

"I have never seen oat hulls ground. I never seen them ground; not alone. I have seen them ground, mixed with other materials. I have never seen them grind oat hulls. I don't know what the customary way of separating or protecting against foreign substances in grinding oat hulls is. I don't know anything about the grinding of them alone."

Testimony of defendant's experts:

George H. De Grood, chief millwright of the H. O. Mills, a large concern operating in Chicago, Hamilton, and Buffalo, testified that in the H. O. Mills they ground oat hulls extensively; that the process adopted by that concern for separating foreign substances from the oat hulls before they went into the attrition mill was to run them through a magnetic separator; that they had no other device in the H. O. Mills for separating foreign substances; that he had never heard of any other device than a magnetic separator which could be used for separating oat hulls from foreign substances before they went into the attrition mill; that a scalper would not be of any use or benefit in connection with a magnetic separator; that he was familiar with the operation of scalpers; and that the effect of using the scalper on oat hulls is that the ground hulls would fill up the meshes of the sieves so completely that it would be ineffective. This witness had had experience in the H. O. Mills for some 13 years, and he stated that from his experience it was his opinion that it would be impracticable to attempt to separate foreign substances from oat hulls by means of the scalping process.

Albert Baxter testified that he was an expert milling engineer of 25 years' experience; had erected mills in every state of the United States except one, and also in Canada, and was the expert consulted in the erection of the mill of the defendant; that the machinery in the mill of the Buffalo Cereal Company was of modern design; that his experience in the construction of mills which grind oat hulls was very extensive, that he had constructed from 50 to 75 mills of that character, and was familiar with them all over the country. Referring to defendant's Exhibit I, he stated that this was the kind of machine that is in defendant's mill; that he had never seen or heard of a scalper or separator being used in addition to an automatic magnetic separator; that there was no other device known to him, other than a magnetic

separator as installed in defendant's mill, for the separation of foreign :substances from oat hulls.

Fred L. Mackenzie, miller of the Husted Milling Company, testified that he had been engaged in the milling business his entire lifetime and worked in mills in various parts of the country; that he had had experience in grinding oat hulls; that the machine used for separating foreign substances from the oat hulls, in his experience, was the magnetic separator; that he was familiar with 'the operation of scalping machines; that he had never seen one used in the process of grinding oat hulls; and that in his judgment a scalper would be ineffectual, because the size of the mesh of the scalper would necessarily be so large that the foreign matter would go through the mesh, as well as the oat hulls.

Lawrence F. Harmon, on behalf of the defendant, testified:

"My business is that of a cereal miller. I am the president of the Buffalo Cereal Company. I have been since it was organized. I am familiar with the construction of the mill. I have been connected with other cereal milling companies. I have built other cereal mills than this one. I was formerly connected with the H. O. Company. I built three mills for them. I am familiar with other cereal mills in this country. I have been in a good many of them. I know generally how they are constructed. I am very familiar with this mill of which I am the president. In mills I have seen, and am familiar with, there is no process other than the magnetic separator for separating these oat hulls from any foreign substance that may collect in it, to my knowledge.

"Q. What do you say as to whether it would be a proper method to use a scalper, in connection 'with this magnetic separator, to pick out any foreign substance that might go through this with oat hulls into this attrition mill?

"A. I do not think it is practical, for the simple reason that oat hulls are so light that they wouldn't sieve through a small hole, and any sieve, wire, or other device that had perforations large enough to allow oat hulls to pass through would allow any small nail, tack, or anything else to go along with it; and I have investigated the thing for 15 or 16 years, and I believe it to be absolutely impracticable."

In the charge the court in substance left it to the jury to say whether or not, in order to have made the place in which the plaintiff was set at work reasonably safe and suitable for the doing of that work, the defendant should have furnished and had, in addition to the machinery that it did have, a so-called "scalper," or sieve, at some point between the elevator and the magnetic separator.

The defendant's counsel, upon this branch of the case, made the following request:

"I ask the court to charge the jury 'that the preponderance of the evidence establishes that there is no necessity for any device to separate these oat hulls than the defendant did use.

"By the Court: I intend to leave that to the jury squarely. I will not charge it in that language.

"(Defendant excepts.)"

The request should have been granted. The preponderance of the evidence established the fact that no machinery additional to that in use in the defendant's mill was required, and that the appliances in use in the defendant's mill were regarded by men of experience and skill as safe and proper, but also that they were the best possible appliances in ues. The plaintiff's experts were without personal knowledge of the

machinery required in grinding oat hulls or its operation. Mr. Gordon had never had any experience in grinding oat hulls. Mr. Ortman testified that he did not know anything about the process, and did not know of a cereal mill grinding oat hulls, as the defendant was grinding them at the time the plaintiff was hurt, that has a scalper in connection with the magnetic separator. The plaintiff's experts, although practical millers, were without any experience in grinding oat hulls, which it appears requires machinery peculiarly adapted to the purpose. The plaintiff's contention that the defendant should have had this scalper, or sieve, at the point indicated by the court, was unproved, and should not, upon the evidence, have been submitted to the jury.

Did the defendant negligently permit an accumulation of dust, which increased the danger from explosion? The court presented the question to the jury in form as follows:

"Another question, which seems to be sharply controverted as a question of fact in the case, is the complaint on the part of the plaintiff that the accumulation of this dust from time to time should have been removed, in order to promote or preserve the safety of the employés as far as possible in doing the work where it existed. The testimony is undisputed that cleaning up of this dust should be done frequently, or at least from time to time, when the bins were empty. There is testimony in the case tending to show that for about a week prior to the happening of this accident—Mr. Kell says for about a week before this accident happened—they were rushed with their work, and that they did not as a matter of fact clean up this place, the dust, as they had been in the habit of doing. Kell says that he spoke to Mr. Thomas about it, the superintendent, and that Mr. Thomas told him it would have to rest, was the substance of it I think, until they got through the rush in their work. That is about the substance of what he claims Thomas said. The contention being on that point that the defendant itself, through its superintendent, was responsible for the omission to clean up this dust for the space of about one week before this accident happened, and the claim is that the accumulation of this dust during that period of time increased the danger involved in allowing the dust to accumulate in that place; and the contention is, on the part of the plaintiff, that by reason of that accumulation during the week or so of time added to and increased the danger. Gentlemen of the jury, I think that is a fair question of fact for you, as to whether it did or not, and if it did, and the plaintiff is otherwise entitled to recover, the defendant, as to that phase of the case, is simply liable to the extent of the increased damage which he sustained in consequence of allowing this omission of the cleaning up of the dust during that period of time. If that were the single proposition in the case, it would be liable to that extent, and that only."

The bins into which the ground product passed after going through the attrition mill were on the third floor and extended below the floor into the second floor. They were about 6 feet square at the top and 5 feet at the bottom, brought down to a hopper, and from 11 to 12 feet in depth, made of matched lumber, dressed on both sides, nailed to upright 2 by 4's, dressed on four sides. The bins were open at the top. The only parts on which dust could accumulate were the 2 by 4 studding inside the bins and the joist which supported the floor above. There was no claim of spontaneous combustion. The dust was explosive only when in contact with fire.

The plaintiff's expert, Ortman, testified:

"I know what a dust explosion is. I have seen one. The cause is dust accumulating in bins, especially when it is in the air. The explosion comes about

after this condition exists; generally by some fire coming in contact with the dust that is floating in the air. I am familiar with the general practice as to cleaning bins which are in daily use for grain, feed, flour, and other products. The practice about keeping bins free and clean from dust is sweeping them out; take a broom and sweep them out; generally do that whenever they are empty. It is customary to clean out bins when they are empty. It might happen once a day; it might happen in two or three days; it might happen once a week. Dust in a bin is created by the fall of the material going down into it. The more dust, the stronger the explosion. The dust that I speak of is known as 'mill dust.' That accumulates every time, to some extent, that you empty flour or any ground product into a bin. The purpose of cleaning bins is to keep them clean; to keep dirt from accumulating. These bins, if they were cleaned every hour, for instance, swept out every hour, and then the ground product would accumulate some amount of dust immediately. There would be a floating dust in the bin. And it would be just as inflammable as though it had been there a week, just as likely to catch fire; but I think it would be nothing but a flash. It would catch fire just as quick if it had been cleaned out an hour or two before, or a week before. It would be a flash, and go out, if there wasn't much dust. If this mill had been running, emptying the ground product in there, and this dust raised up in the bin, that would be just as inflammable and explosive."

Gordon testified that the dust accumulates and rises up in the bins as soon as you pour in the ground product. That fills the air inside of the bin. Assume you sweep out this bin every two hours, instead of every two days, as soon as you commence to pour the ground product into the bin, the bin would become filled with that ground fine powder dust, or the ground product, provided the bin was empty and the stock had a good ways to fall. That would be just as explosive if it had not been cleaned out for two weeks.

The plaintiff proved by Kell, the miller in charge of the mill, that the bins had been cleaned every night, but had not been, as stated by the court, for the space of about a week before the explosion, owing to the rush of work. This, as shown by the testimony of plaintiff's experts, was proper management of the mill. It was also shown by the testimony of Ortman and Gordon that it is the dust which rises and fills the air in the bins, when the mill is in operation, that explodes, and that that is just as explosive if the bins are cleaned out every two hours as if not cleaned out for two weeks. The accumulation of dust on the studding and joist would not add to the force of the explosion. It might possibly have added some fuel to the flame, if fire ensued. But is was the burning of the dust from the explosion, which filled the room in which the plaintiff was at work, that caused the injury. The plaintiff says the flame was a flash. It was a flash, like. There was no noise accompanying it. The plaintiff was at work on the second floor, filling sacks of grain from a spout. The room in which the plaintiff worked was cleaned every day. It was cleaned the day before the accident, so that there was not in that room any accumulation of dust which increased the danger from explosion, assuming that an accumulation of dust adhering to any part of the building would have that effect —a fact exceedingly problematical. An increase of liability of the defendant, as suggested in the charge, because of the accumulation of dust, would be extremely speculative. The explosion was a flash, such as was described by the witnesses Ortman and Gordon.

We think the charge that, if the plaintiff was otherwise entitled to re-

cover, the defendant was liable to the extent of the increased damages sustained in consequence of an omission to clean up the dust, is erroneous.

The further point is made that the court erred in charging the jury that the duty rested upon the defendant to instruct and warn the plaintiff with reference to latent dangers; but, as this will be a matter of further investigation in case a new trial is had, it is unnecessary to enter into a discussion of the question upon the evidence now in the record. The judgment should be reversed.

Judgment and order reversed, and a new trial ordered upon questions of law and fact, with costs to the appellant to abide the event.

McLENNAN, P. J., and WILLIAMS, J., concur.

KRUSE, J. (dissenting). I dissent. The defendant's negligence was predicated upon two grounds: (1) The failure to use reasonable care to clean the oat hulls from pieces of metal and other foreign substances which, in passing through the attrition mill with the oat hulls, would be liable to strike fire, and thus ignite the ground hulls, and in turn fire the dust, which was permitted to accumulate on the sides and corners of the bins, and eventually cause the other mill dust to explode; and (2) the failure to use reasonable care to clean and prevent the dust so from accumulating on the sides, corners, and other parts of the bin, by means of which the smouldering fire in the ground oat hulls would be communicated to the accumulated dust outside the bin, including what permeated the air in the mill, causing it to explode and burn the plaintiff.

I think both causes contributed to the explosion and injury done the plaintiff, so the jury were warranted in finding, and either ground was sufficient to make out a case of actionable negligence against the defendant. Much more care was used in cleaning and keeping clean and free from foreign substances the oat hulls made as a by-product in this mill than the oat hulls which were brought there on the cars and mingled with the hulls made on the premises. The whole oats were first put through several machines to clean them, then dried, then hulled, and passed over fine sieves to remove the dust. The oat hulls were then drawn from the heavier product by air suction and thereafter stored in bins, passing from the bins to the grinder over a magnetic separator to remove such pieces of metal as might still remain with the hulls. The thoroughness of this last mechanism in doing its work necessarily depended to some extent upon the quantity of the material and its speed in passing over the machinery in a given time.

As regards the hulls not made upon the premises, it is not apparent what care was used to keep them clean in the process of manufacture. They were brought to this mill in box cars, and it is clear that pieces of nails and other foreign substances would be liable to get mixed in with the hulls. As showing the lack of cleanliness, it appears that they were taken from the cars and put through grates, the rods of which were a quarter of an inch apart, for removing the coarse substances, and they mixed with the hulls made upon the premises, without subjecting them to further cleaning or process for taking out for-

eign substances, except to pass the mixture composed of these two kinds of hulls over this magnetic separator. I think the proof fairly shows that the magnetic separator was not entirely successful, as fire was frequently found to have been communicated to the oat hulls in the process of grinding, before the fire upon this occasion which caused the explosion. In view of the fact that the hulls from the outside were not subjected to further cleaning, I think it was entirely proper for a jury to say whether the defendant used reasonable care to prevent foreign substances from getting into the attrition mill with the oat hulls in process of grinding, which would be likely to set them afire, and eventually cause an explosion and injure its employés in the mill. And under the evidence in this case it was a fair question of fact whether this device, known as a "scalper," was not practical, and whether, with due regard for the safety of the workmen, it should not have been used.

The scalper is a sieve that oscillates. It is covered with a screen, through which the finer material passes, while the larger is shaken off. One of the plaintiff's witnesses testified it was a method generally in use for preventing foreign substances getting into an attrition mill while it is in operation; and the defendant's own superintendent himself testified that there was a combination of scalpers in the mill, where the product is worked over from one end of the plant to the other in the cleaning department of the cereal mill, and that all of the oats that come into the mill are ground there and have to go through the different scalpers. That, of course, referred only to the hulls made in the mill. He described what was called a "receiving separator," saying that it is a similar device to the scalper; that what the plaintiff's experts described was the same thing, but having about six times the capacity. There was other evidence upon the practicability and necessity of using such an appliance. It seems to me it can hardly be said that there was no evidence to warrant submitting to the jury the carelessness of the defendant upon this branch of the case.

It is unnecessary to refer to all of the testimony showing the danger of allowing dust to accumulate on the sides of the bins. The testimony of one of the plaintiff's witnesses, an expert milling engineer, may be taken as a sample. He says, in the business of grinding oat hulls, it is necessary to keep the bins and other surroundings free and clear from all unnecessary dust. If there is an explosion on the inside of the bin, the fire will produce force enough to carry the conflagration outside of the bin, and, where the outside of the bin, the rooms, the ceiling, and rafters are thick with dust, they carry the explosion. And this is evident from the further fact, which is not in dispute, that for a time the insides of the bins were cleaned every day; and the defendant's superintendent himself testified that he knew of several times before when fire was found in the bin, and that if it got into the bin there was liable to be a dust explosion, which would endanger the lives of the workmen. He claimed that the room was cleaned every day, but he could not swear whether the bins were cleaned every day for the week before the accident. He denied, however, saying to the man whose duty it seems to have been to clean the bins to refrain from cleaning them, owing to stress of work, as testified to by the workmen.

101 N.Y.S.—58

As has already been stated, I think that, upon both branches of the case upon which negligence was charged against the defendant, there was sufficient evidence to submit the case to the jury. But even if the best appliances and the best machines had been used for cleaning the oat hulls and freeing them from foreign substances, yet if the defendant was negligent in permitting the dust to accumulate in the bins and mill, so as to endanger the safety of the workmen, that alone was sufficient to charge the defendant with such want of care as to subject it to liability for the consequences of the explosion, assuming, of course, that the plaintiff's case was made out in other respects.

I think the judgment should be affirmed.

SPRING, J., concurs.